UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | 3:21MJ644 (TOF) |
| | : | |
| | : | ss: Hartford, July 1, 2021 |
| | : | |
| COUNTY OF HARTFORD | : | |

AFFIDAVIT

I, David Carney, having been duly sworn, do hereby state:

## I.     INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since 2010.  Prior to joining the FBI, I was employed as an Intelligence Officer in the United States Marine Corps as well as a Correctional Officer for the Middlesex Sheriff's Office in Billerica, Massachusetts.

2.      As a Special Agent for the FBI, I have received basic drug training at the FBI Academy located in Quantico, Virginia.  I have attended FBI-sponsored training focusing on the use of informants and cooperating witnesses.  I have also attended additional gang and narcotics trainings sponsored by federal, state and local law enforcement agencies.  I have written and executed search warrants that have resulted in the seizure of illegal drugs and evidence of drug violations.  I have executed warrants that have resulted in the seizure of assets acquired with drug proceeds and assets utilized to facilitate drug activities. As a federal law enforcement, I have participated in numerous investigations involving the illegal distribution of controlled substances. I have coordinated controlled purchases of illegal drugs utilizing confidential sources and cooperating witnesses.  I have coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs, illegal firearms and acts of violence to

1

include homicide.  I have conducted electronic and physical surveillance of individuals involved in illegal drug distribution, analyzed records documenting the purchase and sale of illegal drugs, and testified before federal grand juries regarding such matters.  I have also interviewed admitted drug traffickers, drug users, informants, cooperating defendants, and local, state and federal law enforcement officers regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs.  I have supervised the activities of informants and cooperating witnesses who have provided information and assistance in the federal prosecution of drug offenders.  I have previously served as the co-case agent and administrative agent on two Title III investigations and have participated in numerous other Title III investigations.

3.     I am currently assigned to the FBI's Northern Connecticut Gang Task Force ("NCGTF"), an FBI sponsored Task Force consisting of officers from the Connecticut State Police, East Hartford Police Department (EHPD), Hartford Police Department (HPD), West Hartford Police Department (WHPD), New Britain Police Department (NBPD), and Connecticut Department of Correction (DOC).  I am one of the case agents that have directed the investigation that is the subject of this Affidavit, in conjunction with Detectives of the Connecticut State Police, Detectives of the Hartford Police Department's Vice & Narcotics Division and Major Crimes Division, and members of the NCGTF.  I have participated fully in this investigation and, as a result of this participation, as well as information provided by other law enforcement officers, I am thoroughly familiar with the information contained herein.

4.     This Affidavit is submitted in support of a search warrant for a device identified as: one black Apple iPhone, model A1778 (iPhone 7), bearing FCC ID BCG-E3091A, and assigned

call number (757) 373-7517 ("**Target Device 1**")**,** which was seized on June 24, 2021 from the possession of Glen DAULPHIN, date of birth xx-xx-1972, at the Newington Police Department, 200 Garfield Street, Newington, Connecticut, and which is presently in the custody of the FBI, New Haven, Connecticut.

5.      There is probable cause to believe, and I do believe, that the **Target Device** is an instrumentality of and contains evidence of violations of Title 18, United States Code, Sections 922(g)(3) (possession of a firearm by an unlawful drug user or addict), Title 18, United States Code, Section 924(c) (use or possession of a firearm in furtherance of a drug trafficking crime), Title 18, United States Code, Section 922(d) (sale or dispose of a firearm or ammunition to a prohibited person), and Title 21, United States Code, Section 844(a) (unlawful possession of controlled substances) (collectively the "SUBJECT OFFENSES").

6.      As this affidavit is being submitted for the limited purpose of obtaining a search warrant for the **Target Device**, I have not included all the facts and information obtained during this investigation.  Rather, I have included only those facts, which I believe provide probable cause to conduct the requested search.

## II.  SUMMARY OF THE INVESTIGATION AND PROBABLE CAUSE TO SEARCH TARGET DEVICE 1

### Initial meet between the CHS and DAUPHIN

7.      On June 24, 2021, TFO and Hartford Police Detective Abhilash Pillai received the following from an FBI confidential human source (CHS), who is also a Hartford Police confidential informant.  The CHS has previously provided information to investigators which has led to the seizure of narcotics, weapons, and the arrests of narcotic traffickers.  Information previously provided by the CHS has also led to the successful prosecution of individuals who were

arrested for the narcotics/firearms violations.  Accordingly, the Affiant believes that the CHS is reliable.  The CHS has been registered as a confidential informant (CI) with the Hartford Police Department and a confidential human source for the FBI for approximately one month but has been providing information to Hartford Police since 2015. The CHS is providing this information to assist law enforcement officials for monetary reasons. The CHS has been previously convicted as an adult of felony and misdemeanor offenses to include narcotics offenses, violations of restraining order, and interfering with police officers.

8.      The CHS advised that s/he was inside 197 Tremont Street, Newington, Connecticut (hereafter "DAUPHIN's residence") during the early morning hours of June 23, 2021.  The CHS advised that s/he drove an unidentified male (UM) to the DUAPHIN's residence so that the UM could deliver a resident of DAUPHIN's residence, two "eight balls" (approximately seven grams) of crack cocaine. Upon their arrival at DAUPHIN's residence, the CHS and the UM were escorted inside the residence by a white male, who identified himself as "Glen."  Once inside the residence, the UM introduced the CHS to "Glen."  Inside the house was "Glen's" roommate, who was identified as "Mike."  The CHS described "Mike" as a shorter white male, with black hair.  Once inside, the UM handed the crack cocaine to "Glen."

9.      Later, while inside DAUPHIN's residence, the CHS had a conversation with "Glen." The CHS believed that "Glen" may have been under the influence of some type of drug because "Glen" was very comfortable talking with the CHS.  "Glen" told the CHS that he wanted to show the CHS something.  "Glen" then escorted the CHS to the basement of the residence. In the basement, the CHS observed numerous firearms (handguns and rifles) affixed on multiple walls of the basement.  "Glen" then escorted the CHS to a large safe.  "Glen" opened the safe and

4

told the CHS to look inside.  Inside the safe, the CHS observed numerous handguns and assault type rifles.  The CHS also observed numerous gun containers inside the safe and on a wall shelf, which contained large amounts of assorted live ammunition.  The CHS told "Glen" that s/he was a "felon" and could not get guns.  The CHS asked "Glen" if he would sell the CHS some of his guns.  "Glen" responded that he could not sell any guns now because some of the guns were under his name. "Glen" also stated that some of the guns he had were not legal, and that he [Glen] could get fifty years in jail for possessing them.

10.     The CHS also observed several boxes, which appeared to be gun boxes, on the floor of the basement.  The CHS asked "Glen" about the boxes.  "Glen" stated that they were "ghost guns."  "Glen" stated further that he purchases gun parts online and makes "ghost guns."  "Glen" also told the CHS that he has been addicted to crack cocaine for a while and that he has purchased well over $40,000 worth of crack cocaine.  "Glen" asked the CHS if s/he was able to obtain crack cocaine for him to which CHS replied that s/he could.

11.     "Glen" continued talking to the CHS and related that Glen's his wife killed herself years prior and that her brother was abusing her.  "Glen" told the CHS that he wanted to "get" the brother-in-law and that he [Glen] was going to "snap" and wanted to do some stuff like "Columbine."

12.     "Glen" also showed the CHS a box, which contained what appeared to be six or seven grenades. "Glen" also stated that he makes his own dynamite.  The CHS believed that "Glen" has well over 50 firearms inside the Target Premises.  The CHS also observed multiple body armor vests.

13.     Before departing the vicinity of DAUPHIN's residence, the CHS took photographs

of the vehicles parked in the driveway and sent the photographs to investigators.  Investigators then queried Connecticut DMV and determined that the vehicles were registered to Glen DAUPHIN, date of birth xx-xx-1972 of 197 Tremont Street, Newington, Connecticut.  DAUPHIN was previously issued a Connecticut pistol permit and has numerous guns (handguns and long guns) registered to him.  Investigators later obtained a DMV photograph of DAUPHIN and showed it to the CHS.  The CHS confirmed that "Glen" was the person in the DMV photograph.

## Ammunition Acquisition on June 24, 2021

14.     At approximately 9:30 a.m., on June 24, 2021, at the direction of investigators, the CHS called **Target Device 1**, which is the number DAUPHIN provided the CHS.  The CHS was instructed to ask DAUPHIN for ammunition if DAUPHIN could not provide the CHS with a ghost gun.  DAUPHIN agreed.  Investigators later inspected the CHS's phone and confirmed that there was a two minute call from CHS to **Target Device 1** at approximately 9:30 a.m.  At approximately 11:45 a.m., investigators met with the CHS at a secure location for the purpose of making a recorded phone call to DAUPHIN.  DAUPHIN directed the CHS to his residence.

15.     Meanwhile, investigators established surveillance in the vicinity of 197 Tremont Street, Newington, CT (DAUPHIN's residence) and observed the following vehicles parked in the driveway: a tan 2004 Chevy Tahoe, bearing CT license plate AR87469, registered to Glen DAUPHIN of 197 Tremont Street, Newington, CT; a gray 2008 Hyudai Azera, bearing CT license plate 975NPS, registered to Nicholas DEFRANCESCO (deceased) of 116  E Robbins Avenue, Newington, CT; and black 2002 Toyota Tundra, bearing CT license plate 36CF57, registered to DAUPHIN.

16.     At the secure location, the CHS was provided with an audio/visual recording device

6

and transmitter, along with prerecorded FBI evidence funds for the purpose of purchasing ammunition.  The CHS then left the secure location, followed by investigators as s/he traveled to DAUPHINS' residence.

17.     At approximately 11:53 p.m., investigators observed a white male, wearing a white tank top and black shorts standing in the doorway of 197 Tremont Street.  Investigators were able to observe a tattoo on his shoulder.  After review of the audio/video recording and review of social media accounts, investigators subsequently identified above described male as Michael NIEDZWIECKI, with a date of birth xx-xx-1985.  NIEDZWIECKI is a felon with a previous conviction for assault 2nd second degree on March 22, 2017 in New Britain (CT) Superior Court.

18.     At approximately 11:56 a.m., investigators observed the CHS arrive on Tremont Street and be waved over by NIEDZWIECKI, directing the CHS to park in the driveway of 197 Tremont Street.  NIEDZWIECKI greeted the CHS and subsequently brought the CHS into 197 Tremont Street.

19.     At approximately 12:00 p.m., investigators heard on the transmitting device DAUPHIN discuss armor piercing rounds for an AR-15 rifle and agreed to sell the ammunition to the CHS in exchange for $150 and an "eight-ball" (3.5 grams) of crack cocaine.

20.     At approximately 12:02 p.m., investigators heard on the transmitting device a discussion between DAUPHN and the CHS about the process of obtaining "ghost gun" parts and building a firearm.  Investigators were able to observe both DAUPHIN and NIEDZIECKI in the video during this discussion.

21.     At approximately 12:05 p.m., investigators observed the CHS walk out197 Tremont Street, along with DAUPHIN and NIEDZWIECKI, and proceed to the CHS' vehicle.

Shortly thereafter, 12:06 p.m., investigators observed DAUPHIN and NIEDZWIECKI reenter the 197 Tremont Street.  Investigators then observed the CHS exit the driveway in his/her vehicle and proceed north on Tremont Street.  Investigators then followed the CHS to the secure location where s/he turned over excess evidence funds, various ammunition rounds and parts to a Polymer 80 "ghost gun."  More particularly, the CHS turned over: one Maxwell House coffee container which contained two Magtech Guardian Gold 9mm Luger +P 115 gr. JHP boxes of ammunition, with each box containing twenty (20) 9mm hollow point rounds, stamped "CBC 9mm +P"; one Magtech Guardian Gold 9mm Luger +P 115 gr. JHP box of ammunition which contained twenty-one (21) 9mm hollow point rounds, stamped "CBC 9mm +P" and fifteen (15) hollow point rounds, stamped "WIN 9mm Luger"; 101 full metal jacket rifle rounds each casing stamped "LC  02"; one Green colored canvas zip up bag which contained one P80 "Polymer 80" PF940v2 80% pistol frame and jig kit which included one gray pistol frame, one jig, one end mill and drill bits, one locking block rail system, one rear rail module; one Black threaded silencer, one threaded 9x19 pistol barrel and one pair of white cloth gloves.

22.     Below is a photo of the seized evidence:



23.     The CHS was debriefed by investigators and provided the following information. Upon arriving at the 197 Tremont Street, the CHS was met outside by a white male the CHS knew as "Mike."  The CHS and "Mike" then proceeded into 197 Tremont Street and into the basement. DAUPHIN was also in the basement.  While inside the basement of the Target Premises, s/he observed handguns, long guns, and large quantities of ammunition.

24.     DAUPHIN handed the CHS a plastic coffee container with multiple rounds of rifle ammunition and a few boxes of pistol ammunition. The CHS stated DAUPHIN attempted to negotiate the price for the ammunition in exchange for crack cocaine. Specifically, DAUPHIN requested $150 and a "50 piece" ($50 worth of crack cocaine) for the ammunition.  The CHS told DAUPHIN the s/he was unable to get the crack cocaine and paid DAUPHIN $200 for the

ammunition.

25.     The CHS also asked DAUPHIN if he would sell any of his firearms to the CHS. DAUPHIN told the CHS that the guns he owned were registered in his name and that he could not sell them, but that he would see what he could do about going "down south" and getting firearms.

26.     The CHS also inquired about the "ghost guns."  DAUPHIN showed the CHS a kit to build a "ghost gun."  The kit included several pieces of a firearm to assemble into a functional firearm.  The CHS asked how much DAUPHIN how much he wanted for the kit.  DAUPHIN stated that he paid $300 for the kit and they agreed on a price of $400.  The CHS then exchanged $400 for the "ghost gun" kit.  Shortly after, the CHS left the DAUPHIN's residence.

27.     Approximately 20 minutes after the CHS had left DAUPHIN's residence, the CHS called DAUPHIN on **Target Device 1**.  The CHS' phone was on speaker mode and overheard by TFO Pillai.  The CHS ask DAUPHIN if he needed any "hard" (crack cocaine) and DAUPHIN stated yes.  The CHS then asked DAUPHIN if he had any .40 caliber ammunition and DAUPHIN confirmed that he did.  The CHS proposed exchanging a "100 piece" of crack cocaine in exchange for the ammunition, and DAUPHIN agreed. The CHS stated that s/he would be in contact and the call was terminated.

28.     Section 922(g)(3) of Title 18 of the United States Code prohibits persons who are unlawful users of or addicted to controlled substances from possessing firearms and ammunition. I know from my training and experience, as well information received from other law enforcement officers involved in this investigation, that many of the firearms registered to DAUPHIN were manufactured outside the State of Connecticut.  I also know that some of the ammunition sold by DAUPHIN to the CHS was manufactured outside the State of Connecticut.  In particular, the

MagTech 9mm ammunition sold to the CHS was manufactured in the State of Minnesota.

### Dauphin's Arrest and Search of his Residence

29.     On June 24, 2021, United States Magistrate Judge Robert A. Richardson authorized a search warrant for DAUPHIN's residence and an arrest warrant for DAUPHIN charging him with the possession of firearms and ammunition by an unlawful user of controlled substances, in violation of 18 U.S.C. § 922(g)(3).

30.     Because of the information that DAUPHIN was in possession of a large number of firearms and possibly explosive or destructive devices, investigators devised a plan to get DAUPHIN and NIEDZWIECKI out of the residence.  The plan involved a Newington Police officer calling DAUPHIN to invite him to come to the Police Department to view or receive evidence that was collected by the Newington Police in connection with its investigation of the untimely death of DAUPHIN's wife in November 2019.  DAUPHIN agreed to come to the Newington Police Department.  Investigators conducting surveillance of DAUPHIN's residence observed DAUPHIN and NIEDZWIECKI leave the residence, enter DAUPHIN's Toyota Tundra and drive to the police department.

31.     Upon arrival at the Newington Police Department, DAUPHIN and NIEDZWIECKI entered the Police Department where DAUPHIN was arrested on the federal arrest warrant.  On his person was **Target Device 1**.  A search of DAUPHIN's vehicle resulted in the seizure of two firearms and what appeared to be a "crack cocaine" pipe.  DAUPHIN was advised of the federal arrest warrant and was interviewed by FBI Special Agent Genaro Medina.  SA Medina first advised DAUPHIN of his *Miranda* rights, which DAUPHIN acknowledged and agreed to waive.  During the interview, DAUPHIN made multiple statements including acknowledging that he was using

crack cocaine and, in fact, had smoked crack cocaine before coming to the Newington Police Department.

32.     On June 30, 2021, your Affiant dialed (757) 373-7517 while in the presence of **Target Device 1** to verify that **Target Device 1** was the same phone used to communicate with the CHS to discuss the acquisition and exchange of firearms and ammunition for crack cocaine. When I dialed the above number, I heard it ring and observed my number on **Target Device 1** screen as the incoming call number.

### III. <u>TECHNICAL TERMS</u>

29.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.   Wireless telephone:  A wireless telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing electronic communications such as text messages and email; taking, sending, receiving, and storing photographs and video; storing and playing audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device

   b.   Digital camera:  A digital camera is a device that records still and moving images digitally.  Digital cameras use a variety of fixed and removable media to store recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  GPS:  A GPS navigation device uses the Global Positioning System ("GPS") to display its current location.  It often contains records of the locations where it has been and addresses and directions to locations programmed by the user. The Global Positioning System consists of 24 NAVSTAR satellites orbiting Earth.  Each satellite contains a precise clock and repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculates the antenna's latitude, longitude, and sometimes altitude, with a high level of precision.

d.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.   Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

e.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

30.     Based on my training, experience, I know that **Target Device** has different capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, a hand-held radio, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, as well as evidence relating to criminal associates with whom the **Target Device** was in contact.

31.     With regard to **Target Device 1**, I request permission to enter and search the device for evidence relating to the SUBJECT OFFENSES.

32.     Furthermore, based on my training and experience, I know that wireless phones can contain electronic communications between co-conspirators who distribute narcotics or traffick firearms and ammunition, or conspire to do so, such as SMS, MMS, and electronic mail.  Also based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of internet searches for locations and addresses of businesses associated with the unlawful distribution of narcotics and trafficking of firearm and ammunition.  Also based on my training and experience, wireless phones may contain videos and images of contraband, firearms, co-conspirators, and locations associated where these items may be located or concealed.  I also know based on my experience and training that some wireless phones are equipped with GPS data, which would also show locations where DAUPHIN obtained narcotics, as well as locations of meetings involving narcotics traffickers.  Additionally, based on my training and experience, I know the following information tends to exist on wireless telephones, including phones used by those involved in the unlawful possession of narcotics and trafficking of firearms or ammunition:

    f.  the telephone number, ESN number, serial number, and SIM card number of said device;

    g.  the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

    h.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the SUBJECT OFFENSES;

    i.  any and all records, however created or stored, which tend to demonstrate ownership and use of the device, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the device;

    j.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the device, such as passwords, sign-on codes, and program design;

14

     k.   GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

     l.   saved searches, locations, and route history in the memory of said device;

     m.  internet browsing history, to include, internet searches in the memory of said device; and

     n.   Images and videos in the memory of said device.

33.    It is also requested that the Court authorize the retrieval of the above-described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.  I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant.  Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure.  Therefore, it is often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34.    The warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

35.    As described above and in Attachment A, this application seeks permission to search and seize things that **Target Device 1** might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store

15

information for long periods of time.  Even when a user deletes information from a device, it can sometimes be recovered with forensics tools.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

36.     Searching for the evidence described in Attachment A may require a range of data analysis techniques.  In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant.  Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information.  These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment A, or perusing all stored information briefly to determine whether it falls within the scope of the warrant.  In light of these difficulties, the FBI intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment A.

## IV.   <u>CONCLUSION</u>

33.   On the basis of the foregoing information, there is probable cause to believe that fruits, instrumentalities and evidence of the SUBJECT OFFENSES will be found within **Target Device 1**.

David Carney
Digitally signed by David Carney
Date: 2021.07.01 14:15:09 -04'00'

_____
DAVID CARNEY
Special Agent
Federal Bureau of Investigation

The truth of the foregoing affidavit has been attested to me by FBI Special Agent David Carney over the telephone on July 1, 2021.

XXXXXXXX Date: 2021.07.01
/s/ TOF        18:14:27 -04'00'
_____
THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE